We are so fortunate because today there are only two of us, and one of him, our visiting judge, Judge William Connolly. Happy to be here. Thank you. So, hello, and here we go. Our first case is appeal number 153830, and it is United States of America v. David Johnson. Are you related? Oh, thank you. You'll all understand. Good morning. I'm Lisa Wood. I represent David Johnson. Now, I know how hard this is because I sometimes whisper, but you're going to have to speak louder because one of us up here is very old. I'll do that, Your Honor. Like I said, I represent David Johnson in this appeal, and this morning I'd like to focus my attention on the vulnerable victim argument, although I can answer questions about the other arguments if the Court wishes. The Amos victims were not vulnerable under the meaning of Guideline 3A1.1b1. Under that guideline, a two-point enhancement is imposed when an offense involves victims who are unusually vulnerable due to age, physical or mental conditions, or who are otherwise particularly susceptible to the criminal conduct. But weren't the Amos victims under financial distress, and they didn't have any sophistication in the real estate area, and so that made them particularly vulnerable? So those are two characteristics that may make victims vulnerable in other crimes, but it didn't make them vulnerable here. With regard to their general unsophistication, there's no evidence in the record that my client, David Johnson, knew or should have known about that. I'm having trouble with that because, first of all, it's a point error, right? Because we're just talking about, I should say just, but we're talking about the advisory sentencing guidelines. Yes, that's correct. And it's the judge's obligation under the guidelines to determine how the points apply. There was certainly vulnerability. I'm not sure there's anything, and maybe this is my lack of familiarity with 3A1.1b1, but I wasn't aware there was a knowledge component by the perpetrator. It's simply under the guidelines what the victims were. Here they were vulnerable. I believe that there is a knowledge requirement written into the guideline. I believe, and I don't have my guidelines here. Weren't many of them, forgive me for interrupting, but weren't many of them here in this country without proper documentation? At least some of them were undocumented. Weren't many of them individuals who barely, if at all, spoke English? That's correct. You're not saying that this gentleman spoke Spanish, are you? He did not, but the victims had both a translator and a representative from the prosecutor's office present with them at all stages during both their meetings with Mr. Johnson's co-defendant and others, as well as at the closing, which is the only interaction Mr. Johnson was actually present for. But you're not denying that he was present before these individuals who were being assisted by an interpreter during the final closing transition? Correct. He was present at the closings where there was an interpreter and a representative from the prosecutor's office. So you're not suggesting that they had any kind of experience other than this experience in the real estate area? I don't think there's any. I don't think that they, I think the finding was that they didn't, and I don't think there's anything in the record that would dispute that. Even setting aside the knowledge requirement, however, the characteristics of the victims that the court found made them vulnerable may make them vulnerable in other situations. However, it didn't here. I guess I keep coming back to whatever nuance you could make, it's plain error review. The judge who sentenced saw all of the evidence, and we give substantial deference to that. I don't understand how we would fight through a nuance for two points in the guideline where we give substantial discretion to the trial judge. I understand that it is plain error. However, I think the fact that it, and it was clear from the trial testimony and then clear to the trial judge that these victims were assisted by a translator and by a representative from the prosecutor's office. And under this circuit's case law, the assistance of a translator tends to ameliorate whatever vulnerability the lack of being able to speak English might impose on a victim. I think that is the biggest, the fact that these victims were assisted by agents I think is the biggest thing that the court missed below. I'm sorry. But it wasn't just that they spoke a different language, that they were assisted by an interpreter, but that they were low income, they were in a vulnerable position generally as you concede. I mean, isn't that enough to sustain the district judge? Well, one thing I'd like to point out is that the judge didn't rely on the fact that they were low income or in a generally vulnerable situation in implying this enhancement. In what? A generally vulnerable situation in applying this enhancement. In its brief, the government talks about how the victims may have been susceptible to homelessness. That wasn't something the judge relied on in making his findings. He was explicit in finding that the victims were vulnerable because they didn't speak English, because at least some of them were undocumented, because they had minimal experience conducting real estate transactions, and because they were previously victims of real estate fraud. So whether or not they could be characterized- Right there, that last one. Doesn't that just harm your argument greatly? They had already been victims. They're being re-victimized. It doesn't, Judge, because under this case law, the situation in this case is completely an opposite to the case law that talks about repeat victimization and how that makes somebody particularly susceptible. This is not a reloading case that was like a telemarketer reloading scheme that was discussed in Johnson and some of this court's other case law. The perpetrator of the first fraud was completely different than the perpetrator of the second fraud. And obviously I'm not waiving our sufficiency argument, but assuming that those convictions will stand, the perpetrators are completely different. But that's still a factor that we can consider. Right now, you have one factor going for you, which is that they had advisors. And then there are a lot of factors that don't go for you that are not in your favor, and it's in the district court's discretion to weigh and to value which factors mean the most in terms of sentencing. One of the things I would say, Judge, is that I think it's significant that the representatives from the prosecutor's office obviously didn't see on its face anything wrong with this transaction when they were representing the victims at the closing. And 3A1.1B1 talks about unusual vulnerability. And I think the question that's appropriate to ask is, would this have raised red flags or would people have found out about it without, that didn't have the characteristics that these victims did? Now, I want you to watch your lights. I will, Judge. And that goes for everyone in this courtroom. But I think that's an appropriate question to ask here. And the answer, no, is no, it wouldn't have raised red flags. So now you realize you just have a minute left for rebuttal. I do. And I'll just sum up by saying that it didn't raise red flags among these people who would not have been vulnerable. And for that reason, I don't think it's an appropriate enhancement. And I will reserve the rest of my time. Thank you, Ms. Wood, very much. Thank you. Good morning, Your Honors. Sarah Varner on behalf of Reginald Walton. I'd like to continue co-counsel's conversation with you this morning with a discussion of the district court's decision to apply a four-level enhancement to Mr. Walton and his co-defendant's offense level based on the district court's decision that Mr. Walton was a public official who occupied a high-level decision-making or sensitive position. The guidelines characterize those positions as someone who has direct authority to make decisions or substantial influence over decision-making processes. Well, tell me this. Would any of these sales happen if Walton had not been matching private buyers to particular properties and then arranging for a charitable pass-through? No, Your Honor, but I think that's a different question as to what… Well, in that sense, he seems to have been a high-level decision-maker. He was in a unique position to run these deals through on behalf of the city, absolutely unique. His position found its home within the Department of Metropolitan Development. The Department of Metropolitan Development was run by a director, seven administrators, and then 16 to 20 assistant administrators. Well, wasn't he responsible for introducing the resolutions for the land bank transfers? And as I understand the evidence, his superiors rarely reviewed those resolutions. In other words, they had faith in him, trust in him, and those resolutions passed. He was responsible for introduction, but I think we have to be careful with how we use that word. Even his supervisor, his direct supervisor, who is really the best evidence of this at trial, testified that that amounted to really nothing more than him filling out a form. It's not a form that he signed. That form then went through. She testified herself, three levels of bureaucratic review. She reviewed it herself. She signed off on a cover sheet. She sent it to a legal department. When you say reviewed it, she, all the way up to the mayor, never had any knowledge of the transactions. It was up to him to arrange the transactions. I'm not sure the fact that there's a number of people who review it is in any way dispositive of who has the authority to make the determination. I think it is if we look at what, well, first of all, I think we have to look at what his direct supervisor testified to. What she testified to was that explicitly the evidence that we have in the record was that he had no authority or influence after that form passed out of his hand. In fact, we have testimony at trial that in some of these transactions, he was unable to get approval to put that property into the land bank. His co-defendants themselves also testified. He took extensive efforts. He made extensive efforts to cover his tracks. He required cash payments. He made sure that his name stayed out of the deals. And you know something? His dealing really did hit a low point when he used this process to, quote, help, unquote, the victims of a different fraud. The fact that he had these supervisors who were asleep at the switch cannot help him. I think what you're really addressing there, Your Honor, is whether or not he had the specific intent to defraud when you cite those factors about whether he was concealing his involvement. But when we're looking at this guideline enhancement, which does make a significant difference to his sentence, we have to think about does he fit within what the guidelines called, what the guidelines said was direct authority to make decisions or substantial influence. Now, I think if we go further in this case and we look at some of the case examples cited by the government, we can see a big disparity between the cases where this enhancement has been applied and the case that's before you today. For example, both parties relied on Hill. And Hill was a deputy liquor commissioner. I know you all, Your Honors, are familiar with this case. And this court said he had an inordinate amount of direction over the licensing and renewal of those liquor licenses. And the distinction you draw between Hill and your client is what? Because that language sounds exactly right. Your client had inordinate control. I think that the distinction I would draw is that in that case, this court said he exercised de facto authority and that there was no oversight by the mayor in that case. And in this case, I don't think Mr. Walton could be described as exercising de facto authority. And that's the problem I have. I think that's exactly how it could be described. And even if my judgment doesn't matter, it's plain error. I don't see how we could second-guess a district judge who reached essentially that conclusion. I think that we can in cases where it's clear that a mistake has been made. And that I think in this case when we look at it. Well, I agree. If it were clear that a mistake had been made, we definitely have the authority. Yes, Your Honor. What I'm saying is the very standard you've just described is well within the rubric of what the facts are for your client. I think it might be instructive for us to look at another case cited by the government, Watkins, which was a Sixth Circuit case. I think that case that might be the case that has the most familiar feel to the facts in this case. In that case, the defendant was a technical supervisor for safety and security for a school district. But in that case, I think the most stunning difference is that in that case his direct supervisor testified. Justice Reggie's direct supervisor testified in this case. And his supervisor testified that he had great influence over the process and that he relied extensively upon his expertise. And that is testimony that is simply missing from this case. We don't have any testimony. We don't have a testimony from anyone on the board who said what factors they looked at. The government said in their brief that Mr. Walton. Yes, Your Honor. All right. Go ahead. Finish your thought. The government laid out in their brief that there was testimony that they relied upon Mr. Walton's judgment. Now, with respect, I don't think that testimony existed. That sounded wrong to me. And when I combed back through the testimony, all I could find was a question to Fultz that said, was Mr. Walton questioned by the land bank? And the answer to that was no. And I think that can be construed in a number of ways. There was just no testimony in this case that he had that level of influence. You know, Walton argued that he would have taken the same actions whether or not anyone had paid a kickback. Why would anyone pay then? Why did he arrange to receive kickbacks for doing work that he was already being paid to do by the city? I truly could not understand that argument. I think that Mr. Walton acknowledges that there are some difficulties with his sufficiency argument, and that's why we've chosen to argue the sentencing before you this morning. And if there are no other questions, I'll reserve the rest of my time. Thank you very much. Now, Mr. Wood. Yes, Your Honor. No relation that I'm aware of. Bob Wood on behalf of the government. Your Honor, may it please the Court. I'd like to start with the Court's permission with a few quick responses. The first is this point that if the prosecutors fell for Reggie Walton and David Johnson's trick, then that makes the victims less vulnerable. Of course, the prosecutors were going out of their way to help the victims, and they put their trust in a fellow city employee. I think that's a very reasonable thing to do. And Walton violated that trust just as he did throughout the case. The second, I'd like to pick up on Your Honor's point about plain error review. In a passage in Hawkins, the Court discussed the effect on substantial rights of the defendant, given the advisory nature of the guidelines, of the fact that the sentence there was substantially below the guidelines. Here that's true as well. And there's no indication that even with or without the reductions, the two-point and the four-point enhancements, without those, that the Court would have gone even further below where it already was on the sentence. Unfortunately, that's your problem. I'm surprised you're open to that because Hawkins is exactly a case like this one, where the judge went well below the guidelines, but the seventh circuit was left guessing as to whether it would have made any difference because he didn't say anything. And, in fact, Hawkins makes a point of saying, you know, it would really help if district judges would just tell us whether it would have mattered. So if that were the issue in this case, we'd have to remand. So it's an odd one to emphasize. That's a fair point, Your Honor. Were any findings made on the applicability of the vulnerable victim enhancement for Johnson? The Court really just said that he was incorporating his understanding of the testimony at trial. There's no really good finding on his knowledge, as Your Honor has already discussed. So would that be plain error to enhance his sentence without making the necessary factual findings? Well, I think the judge made a factual conclusion based on having sat through all. As he said it, it may have been shorthand. Is a factual conclusion the same as a factual finding? The vulnerable victim enhancement, as I understand it, is factual in nature, and the judge's response to that was that he sat through trial. He listened not only to the victims but also to the people who tried to help those victims. And based on his memory of everything that happened at trial, he saw the victims as vulnerable. And so there was some evidence in the record the problem is not spelling it out. That's how I would see the fullest extent of the problem in the district court's recitation of that, is that the district court sat through many, many days of trial. There were three or four victims testified and three or four people who helped them testify. And instead of recounting all the ways in which he saw them as vulnerable in the Johnson sentencing, and even in the brief way he did in the Walton sentencing, he simply stated that he was relying on his He said it another way. If plain error were the judge failed to fully describe the basis for his finding but there's any number of facts to support it in the record, that would be a very harsh plain error standard. So I'm not sure. What you're saying is the judge heard the testimony at trial, he made a judgment. I can't find at sentencing there's any real discussion of this question of knowledge because the parties were obviously focused on much larger issues before the judge. And on a plain error standard, I'm not sure it's our place to fault him because he didn't take great care in explaining his reasoning. And I don't know, what is the knowledge component that the guidelines suggest? In the commentary, it uses the phrase, knew or should have known. It's not part of the guideline itself, but in the commentary. So it's really potentially both a subjective and an objective standard. Right, and the objective standard, I think, is the one that applies here given that, as Your Honor pointed out, he was present when all the victims were present. The prosecutors were present. Everyone in the city knew about this case. It was in the papers. Would Walton be guilty of anything if he'd engaged in exactly the same conduct but had not taken a share of the proceeds for himself? And I ask this because this program seems to have allowed the use of a charity as a pass-through with immediate resale to a private party. Talk about rife for problems. The program, I apologize. Do you agree that the land bank program allowed everything but the kickbacks? And were the kickbacks specifically excluded? The kickbacks were specifically excluded. There was testimony about that at trial from Jennifer Foltz, his supervisor. All city employees were subjected to a rule not to accept bribes or kickbacks, which seems like a reasonable rule, and speaking of reasonableness or lack thereof, the land bank operations do seem to, although probably designed to permit flexibility in addressing abandoned home issues in the city, seem to have been crafted to allow for a lot of around the edges or even right down the middle advantage-taking. Did the government show that the city received less for these properties than it would have if they'd been sold through the private sale process? In other words, how was the city harmed financially by the crime? There were a couple of ways the government showed it. There was testimony from the Hicks family, for example, who, this wasn't in the government's brief, it's mentioned in the appellant's brief, who had come to Mr. Walton and offered $6,000 for a house, and he said, oh, $6,000, that sounds like just the kind of money that I would rather have and share with my friends than give to the city. And so he said, here's what we're going to do. You can buy it for $6,000 from IMAC, from Indiana Minority AIDS Coalition. And so he used that process instead of the process that he was supposed to use, which was to say, oh, I have a bidder who's already told me what they want. To pay for the property, let's have two assessments done and see if that's an appropriate price, and we'll put it up to the public. And so that's one way. And the other way is there was a lot of testimony or also evidence from wiretaps of Mr. Walton and Mr. Reed discussing what they saw as the fair market value of the properties, and their opinions on those matters came from some of their outside investors they had spoken to. And they would say, for example, this property that they never in fact sold, they thought it was worth $44,000. So there was a public list and a private list. Is that what you're saying? In other words, was there a standard by which Mr. Watkins was to allocate or could he take a property that appeared like it would have some value at sale and say, yeah, but I think, and I'm talking without kickback, and to say I think that this particular nonprofit would do really well or it's a good program and I want to give them a little money, so I'm going to send this potentially valuable property to them at essentially no cost. I think that's the intention of the flexibility built into the system was to allow the land bank director to say the city's best use for this property is either route one, money for the coffers, or route two, a beneficial charity for that neighborhood. But that goes back to Judge Roebner's question then is he would have been able to do this. He could have made this judgment without any kickback involved. Without any kickbacks. And to Your Honor's question about was he guilty of anything. Other than taking money, which I don't. If you take out the kickback and bribe, what he ran afoul of was what he knew was the city's conflict of interest rule in the sense that he was setting, well, I guess if he doesn't get any money, then it's not a separate business. So it's really the kickback that drives this. It's all the kickback. And there were other employees that they mentioned with respect to his specific intent, and he says that what he did was like them. The key differences between those are the intent evidence and his repeated concealment, which Your Honor mentioned, and the kickback. So if anybody else had done the same thing, it would be hard to show that they had any specific intent. It did the same thing without a kickback and without concealment. It would be basically impossible to show that they had the sort of specific intent that a jury would accept. Which I guess is kind of the point of the law, that we don't know what he would have done if he would have acted in the same manner since he was tainted by having taken a kickback. Right. The crux of the case is the repeated kickbacks, prearranged kickbacks. What was the evidence about the existence of two lists of properties? Well, there was evidence that Mr. Walton would send lists of properties, the full list of properties, or even sometimes cold lists of cherry-picked properties, to people he knew both might be interested in buying these properties for a substantial amount of money and might be willing to do so through the methods that he preferred. And then there was a public list that was available if he showed up at the city county building. So it wasn't the city maintaining a private and public list. No, it was a list designed by Mr. Walton to, as I understand it, the way that the government understood and presented the evidence was that these lists were tailored by Mr. Walton to generate interest not only in the properties but in conducting business the way he preferred. But there was no set of standards that said properties that are determined or suspected to be of substantial value should go into the private sale category. There's nothing that directed him specifically. Right. The triggering was his decision. His decision triggered whether it would go into the public sale list or the private. So it was really his list. And that was responsive. It's designed to be responsive to the interests expressed by non-profits on the one hand and private investors on the other. Then he makes a decision whether to shunt it through the public or the private. What was the government's best evidence that Johnson personally benefited from the scheme? Well, I'd say it's twofold. First, he wanted to benefit IMAC, his charity, and that's what he did time and again. And getting what we want is a personal benefit. So I think it's fair for the jury to separate from that. Wait a minute. That doesn't make sense to me. Getting what you want doesn't. Sometimes getting what you want is what everyone wants, what's best. It's hopefully what would happen in any arm's-length transaction is somebody gets something that they want. Otherwise, why enter into the transaction? Well, I suppose that's fair, except that he knew that it was at the expense of the city. He knew what? He knew that it was at the expense of the city. Because he knew that Walden was getting a kickback or otherwise. Right. He knew that he was getting a kickback, and he knew that the money generated from the sale instead of going to the city would go to his charity. But separate from that, Your Honor, if that's, as I suspect, maybe not the most convincing position for Your Honor, he also, with cash, purchased or with money taken right after the Amos victim fraud, he bought a Volvo, a used Volvo at auction. Well, isn't part of the answer he was convicted of a conspiracy? He was conspiring with Watkins. He knew Watkins was violating public trust, violating criminal statutes by taking the kickback, and he decided to stay involved because he was getting properties funneled to him, whether for good reason or whether for public benefit. He knew the way it was transacting was a crime. Yeah, and I guess that's a much more legally well-articulated way of saying what I was trying to say, which is that he knew that it was one or the other. The money would go to benefit who he preferred or the city through Walden. I'm sorry. I'm sorry. Do we know what percentage his charity received and what percentage he received? The evidence the government did not have or attempt to go do a deep dive on dividing it up. There was evidence of money going into his personal account that was traceable to some of this, and there was evidence of the Volvo purchase. Beyond that, there is not – I am not able to recall at this point a lot of good evidence indicating that money didn't go to IMAC. Yeah, I wouldn't stand up here and say that some of this money did not benefit the Indiana Minority Aids Coalition. I don't think that would be fair. And what was his position with respect to the AIDS Coalition? He was the manager, operator. So he drew a salary out of it? I don't want to say because I don't recall from the record, but it was his primary occupation, which makes me think that he must have. But you're not certain what was in the record in that regard? Yeah, the record was that he was in charge of it. Do you want to take a moment to talk about this other question that was the focus of the plaintiff's counsel or the defendant's counsel, and that is whether he had a sufficiently superior position to be a public official for enhancement purposes? For Walton, yeah. I would say that it's true that there's a lot of focus in the appellant's argument on Ms. Volk's testimony that he did not have a lot of influence after drafting the resolution, but his influence was baked entirely into the drafting of that resolution. But the one problem with that argument is it's always true if he's been convicted of a kickback that he was directly involved and must have controlled something. So when does the guideline draw a distinction between someone who's at a lower level, controlled it and hit it enough so his superiors didn't see it, and when is it sufficient control that it becomes subject to the four-point enhancement? Does the guideline give any direction? Not that I'm aware of. There's no indication, for example, if it was an intern who was always successful at doing this, who he was hiding it from, and he told people, I can get you this result every time. He was confident that he was highly influential in the process. He was, in fact, highly influential in the process. I'm happy that that's a different case. I don't know if it sounds to me as though that person is, in fact, extremely influential, that hypothetical intern. But they were enough to be convicted of a crime in your hypothetical, and that's true here, and I think that's what the argument is, that he was in a position to affect the conspiracy and to get his kickback, but he was not, in the greater scheme of things, in charge, remotely in charge. Right. I would say the contrast I would draw is between a case where Walton successfully accomplished his aim of pushing these properties through the land bank sometimes instead of effectively virtually every time. If the government found evidence that someone was engaging in an effective kickback scheme by luckily eking through some properties and getting kickbacks and telling people, we're just going to shoot these through, and hopefully they'll get approved, and when they do, I'll put them through the process the way that I can, and when they get approved, because I'm doing it for you, outsider with money, you can give me a kickback. So is the sweeping nature of his discretion over time that you think justifies the judge's determination that he had the so-called high-level decision-making? In thinking through the line drawing that Your Honor is asking about, through the prism of this case, without trying to think more broadly, that's the best line I can think of to draw is the sheer effectiveness of this demonstrates his influence. As Your Honor put it, none of these deals would have gotten done if not for him, and the evidence of deals that didn't make it all the way through is scant. Now, at least part of the scheme seems to have taken place out in the open. I'm referring to the Amos, the sales to the Amos victims. Was the city aware that Walt was using his loophole to sell to the Amos? No, that's why he asked, excuse me, for cash payments. He wanted to be sure the city, oh, were they aware in the sense that there was this deal going on with the Amos victims? As far as I know, the city was aware, and I think circumstantially you'd have to say that because the prosecutor's office was involved, they came over, but from the standpoint of the land bank, it was not his supervisor who ran any of the meetings. It was Walton. They just blindly signed off on all of it, so they were aware of it, at least at that point. Right. I'm sure that when the MDC signed off on it, at the very least, they identified the victims, or they identified the people who were involved in the transaction. You know, I saw your chart, of course, but how many people were in Walton's position? Well, that was the appellant's chart, and his specific position, no one. There were people who were at an equal level throughout city government. Right. But no one could do what he could do. No one. No one. He was the only one. Even the other employees that they cite as analogous. Right. They had absolutely no ability to even undertake official acts of the sort that he did that put him on the hook. Did anyone decide to list private and public lists besides Walton? Did anyone have authority to contribute to that? To contribute? In other words, to push a property into one category or the other without his approval? It's possible that in the same way that he duped his supervisors, one of the people who worked under him could have manipulated it. But ultimately he had to sign off on where the property went, on which list. Yes, Your Honor. If there's nothing further. Thank you, Mr. Wood. And Ms. Wood. Oh, my goodness. You're not even cousins? I don't think so. Okay. Just to respond quickly to a couple of questions this court had, there was testimony from Jennifer Fultz, who was David Walton's, I'm sorry, Reginald Walton's supervisor, that the city did know about the sale to the Amos victims. She testified that the city couldn't just sell the properties to the Amos victims, that they had to sell through a non-profit using a non-profit as a pass-through, and the non-profit could charge whatever it wanted as a fee. She also knew IMAC was selling the homes for $4,000 each, and she signed off on that. Also, I believe in the sentencing hearing transcript, that establishes that Mr. Johnson was not paid a salary through IMAC. I apologize, I don't know the exact page number, but I can file something supplementally to get you, to get the court that information. So did he get any kind of a fee or honorarium? I mean, was this purely, it said it was his principal occupation. Was he independently wealthy, and that's how he managed to be able to do this? I'm not sure. The record doesn't disclose. I don't believe the record establishes that, but I can certainly point to the location where it establishes he didn't get a salary from IMAC. Lastly, I see my time is up. I just wanted to respond to the government's statement that it was reasonable for the prosecutor's office to rely on Mr. Walton and Mr. Johnson, and I think that misses the point. It certainly was reasonable for them to rely on it, but as the government said, the crux of the crime in this case was the kickback, and as that pertains to the vulnerable victim enhancement, that kind of fraud is just not the type of fraud that would particularly victimize undocumented or unsophisticated people. It's sort of similar to a purse snatching. I mean, the fraud isn't, but perhaps this example. Excuse me. An undocumented person is not particularly susceptible to purse snatching or something else. Their undocumented status in this case didn't make them particularly susceptible to this kind of fraud because even people without those characteristics were, for lack of a better word, duped. So for those reasons, we would ask that you reverse and remand. Thank you. Thank you so much. Now, you were court appointed, weren't you? Yes. Your Honors, I want to just briefly— I didn't forget you. I didn't forget you. I was wondering. I just wanted to briefly address, I think, something that Your Honors hit on, which is line drawing in this case for the high-level decision-making enhancement. And in this hypothetical intern, what Mr. Wood pointed out, if this hypothetical intern were subject to this enhancement, he would be promising a result. He'd be saying he could get it every time and that he could, in fact, and that those aren't the facts that are in front of this court. Reginald Walton, the testimony at trial, showed that he did not promise this result. Every co-defendant testified he did not say he could do this. He could not get it every time, though he suggests that effectiveness should be the test. Is there a case you can point us to as to has our court attempted to articulate or has another court or the Sentencing Commission articulated a standard that these are the necessary components to divide someone from this position, other than the overarching standard of highly placed? I wish that they had. There's nothing in the commentary to the guideline? No, and I could not find a case that was on point that would suggest some sort of test. So if you're a bank robber and every single bank robbery is not successful, is that analogous at all? I don't think so. Analogous? I think what the test should be, regardless of effectiveness, should be testimony, and I think we could return to the Sixth Circuit case in Watkins. They had a supervisor testifying that he had influence. We don't have it here. And in this case, we also had co-defendants testify. What about the government's point that was made? And I apologize, I know your time is up. You can stop me. No, I can't. What about the government's point that it's just? We're so grateful you're here. The government's point that it's just a substantial level of control throughout these transactions. In other words, he's it. He decided which of these, and had to sign off on any land that was given to the nonprofits or sold to them at a very low price, and that that establishes for this purpose that he had the ultimate say, he was the decision maker. I think that if you think about those facts in another way, he's the bottom of the totem pole. He's where the process starts. That doesn't mean that he exerts authority and influence over where the process ends. But so was the Deputy Liquor Commissioner in East St. Louis, right? Yeah. Yes, but in that case, this court said there was explicit that he was acting in de facto way, and in this case, we had testimony from the government's witness that he was not. And with that, we would ask that you reverse and remand. Thank you. Thank you. Thank you so much. Thank you, and thank you for taking on this task and doing such a nice job for your client. And thanks to Ms. Varner, who always does a nice job for hers, and to the government. Thank you very much.